# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re Chardon, LLC, *et al.*,[1] | ) | Bankruptcy No. 13-B-81372 |
| | ) | (Jointly Administered) |
| Debtors. | ) | Chapter 11 |
| | ) | |
| | ) | Judge Lynch |

## MEMORANDUM OPINION

Chardon, LLC and the seven affiliated entities who commenced voluntary Chapter 11 cases[2] seek to employ attorneys Neal L. Wolf and associated attorneys as bankruptcy counsel pursuant to 11 U.S.C. § 327(a). (EFC No. 56.)  The United States Trustee and a secured creditor, FirstMerit Bank, N.A., object.  For the reasons set forth herein, the Chardon Corporate Debtors' application is GRANTED.

## JURISDICTION

The application seeks court authorization of the employment of attorney Wolf and several of his colleagues to represent the eight corporate debtors as debtors-in-possession under Section 327(a) of the Bankruptcy Code.  The matter, therefore, arises under title 11 and this court has jurisdiction to decide the matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) in which this court has constitutional authority to enter final orders.

---

[1] Pursuant to the administrative order entered on July 2, 2014, the bankruptcy cases of Donald Wolf, Jr. (No. 13-B-83571), David Wolf (No. 13-B-83572) and Donald Wolf, Sr. (No. 14-B-81919) were procedurally consolidated for joint administration with the eight corporate bankruptcy cases previously procedurally consolidated for joint administration into the lead case of Chardon, LLC (13-B-81372).

[2] Chardon II, LLC (13bk81373), Intervest, LLC (13bk81374), The Rink of Crystal Lake, Inc. (13bk81375), Wolf Business Center, Inc. (13bk81376), Wolf Family Partnership, LLC (13bk81377), Wolf Investments, Inc. (13bk81378) and Wolf Professional Center Corporation (13bk81379). These entities and Chardon, LLC will be collectively referred to as the "Chardon Corporate Debtors."

## PROCEDURAL BACKGROUND AND FINDINGS OF FACTS

The following sets forth the court's findings of fact as provided by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052.[3]

Attorney Neal Wolf filed voluntary Chapter 11 petitions on behalf of each of the eight Chardon Corporate Debtors on April 17, 2013. With each petition, Mr. Wolf and his associates entered their appearances as attorneys of record for the Debtors. On or about April 30, 2013, the Chardon Corporate Debtors filed several "first-day" motions, including motions to use cash collateral, motions to continue to use prepetition bank accounts and a motion to extend the time to file schedules. On May 9, 2013, this court granted the Chardon Corporate Debtors' motions for joint administration of their eight cases, designating the Chardon, LLC case as the lead case and separately extended the time to file schedules or provide required information to May 15, 2013. Within that time the Chardon Corporate Debtors filed a second extension request which was granted and the deadline was extended through May 31, 2013.

On May 17, 2013, Neal Wolf filed the Debtors' application to employ himself and his then-law firm, Neal Wolf & Associates ("NW&A").[4] The application disclosed the hourly rates of the attorneys and legal staff, ranging from $75/hour for a legal assistant to $580/hour for Neal Wolf. The application also disclosed that NW&A had received a $25,000 retainer on December 19, 2012 from The Rink of Crystal Lake, Inc., and retainers of $50,000 on March 22, 2012 and

---

[3] To the extent that any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[4] The original application sought to employ Neal Wolf and attorneys Mosin N. Khambati, Folarin S. Dosunmu, John A. Benson, Jr. and Dominic J. Dutra, paralegal Sandy Holstrom and legal assistants Diane Wolski and Sarah Scott. In addition, attorneys Dean C. Gramlich and Jacob R. Lenzke, have worked on these cases. However, attorney Khambati and legal Assistant Scott apparently did not follow attorney Wolf and the other professionals to Much Shelist following Neal Wolf & Associates' merger with that firm on February 17, 2014. (Supplemental Declaration in Support of Employment of Much Shelist dated 6/4/14, ECF No. 530.) For simplicity, other than when discussing the subsequent merger with Much Shelist, the court will use the term "NW&A" to refer generally to all of Neal Wolf, his firm, and the other attorneys to be employed by the Chardon Corporate Debtors.

$200,000 on April 11, 2012 from Wolf Builders Corporation, a non-debtor affiliate of the Chardon Corporate Debtors.  It further revealed that NW&A had applied $70,246 in fees and $10,195.49 in expenses against the retainer for pre-petition services, leaving a balance of $194,558.51 in the firm's IOLTA client trust account.  In support of the application, attorney Wolf submitted a declaration attesting that "to the best of my knowledge [I] have determined that neither I nor NW&A have any connections to the Debtors' officers and directors, creditors, any other parties in interest, their respective accountants and attorneys, the United States Trustee, or any person employed in the office of the United States Trustee."

On May 29, 2013, FirstMerit Bank, N.A., a secured lender to several of the Chardon Corporate Debtors, filed its objection to the employment application in which it asserted:  (i) that NW&A had failed to disclose in its application that NW&A had represented certain equity holders and co-obligors of the Debtors and failed to file its fee agreement or to describe in detail the nature of the retainers it had received from a non-debtor related entity, (ii) that NW&A's current or past representation of non-debtor affiliates created a conflict of interest and presents a "manifest lack of disinterestedness" and (iii) that NW&A failed to demonstrate excusable neglect for the filing of its application more than a month after the cases commenced.[5]  On the same date, the United States Trustee filed his objection in which he asserted that NW&A had neither filed a copy of its fee agreement nor disclosed the connections to the non-debtor affiliates identified by FirstMerit.  The United States Trustee further objected that NW&A had had not offered any explanation for its delay in filing the employment application and requested additional information on certain post-petition disbursements.

The eight Chardon Corporate Debtors filed their schedules and statements of financial

---

[5] Colfin BAMO II Funding A, LLC, another secured lender to several of the Chardon Corporate Debtors, initially joined in FirstMerit's objection (See Joinder, 6/21/13, ECF No. 128), but Colfin later withdrew its objection as part of its settlement with the Chardon Corporate Debtors and their principals. (Order Granting Motion to Approve Settlement Agreement, 8/1/14, ECF No. 816.)

affairs on June 1, 2013. Three days later attorney Wolf filed a supplemental declaration in

support of the application to employ in which he described NW&A's prior representation of

three individuals who either directly or indirectly own one or more of the Chardon Corporate

Debtors: Donald Wolf, Sr., Donald Wolf, Jr., and David Wolf (collectively the "Wolf

Individuals") (no relation to attorney Neal Wolf) and attached a copy of an April 17, 2013

engagement letter to the Chardon Corporate Debtors.

According to the supplemental declaration:

- Attorney Wolf first met the Wolf Individuals in the fall of 2012 when they were looking for counsel for a potential restructuring of their companies and companies' debts.
- FirstMerit filed a lawsuit against Wolf Family Partnership, LLC and the Wolf Individuals in the Northern District of Illinois on December 12, 2012.
- Shortly thereafter, one of the Wolf Individuals telephoned Neil Wolf to inform him about the district court action and to hire NW&A for the debt restructuring matters.
- On December 18, 2012, Neil Wolf contacted FirstMerit's counsel to ask for a short extension of the time through January 18, 2013 in which to file their response to the district court complaint, while NW&A would attempt to negotiate a global restructuring or resolution of the Wolf Individuals' and Chardon Corporate Debtors' "obligations to FirstMerit."
- FirstMerit, through its attorney, conditioned agreement to the requested extension upon attorney Wolf (i)  accepting service of process on behalf of all defendants, including the Wolf Individuals, and (ii) filing an appearance on behalf of all the defendants in the district court litigation.  In order to obtain the requested extension and prevent entry of a default judgment, Wolf accepted FirstMerit's conditions.
- Attorney Wolf entered an appearance on behalf of the defendants in the district court law suit on December 26, 2012.
- On January 4, 2013, attorney Wolf sent to FirstMerit's counsel a settlement offer for the global restructuring and settlement of various loans with FirstMerit. The lender quickly rejected the proposal.
- On January 17, 2013, attorney Wolf asked FirstMerit's counsel to agree to a one-day extension of the deadline for the response while "Neal Wolf sought to involve the Wolf Individuals' regular counsel, Robert Hanlon."
- On January 18, 2013, Hanlon filed his appearance on behalf of all defendants and filed a motion to dismiss the complaint.
- On April 2, 2013, FirstMerit voluntarily dismissed the district court lawsuit.
- On April 11, 2013, FirstMerit filed four new law suits against certain of the Chardon Corporate Debtors and the Wolf Individuals in the Northern District of Illinois. Neither attorney Wolf nor NW&A appeared in that litigation which was handled by attorney Hanlon.

In it, Neal Wolf further declared that neither he nor NW&A has ever received any retainer or fee

from the Wolf Individuals.

Attorney Wolf filed his Form B203 Disclosure of Compensation of Attorney for Debtor on June 5, 2013. The form referenced an attached copy of the April 17, 2013 engagement letter that set forth the terms of compensation, among other things

The U.S. Trustee withdrew his objection based on the supplemental declaration only to file a second objection to the application on August 7, 2013. In the August objection, the U.S. Trustee alleged that NW&A had signed a separate, previously undisclosed engagement letter with Donald Wolf, Sr., Donald Wolf, Jr., David Wolf and "certain affiliated entities" on December 20, 2012. The 2012 engagement letter contained a reference to the receipt of a $25,000 retainer. The U.S. Trustee asserted that NW&A first turned over that engagement letter on July 24, 2013 only after the court ordered its production. The U.S. Trustee further asserted that NW&A and the Debtors had failed to establish that the engagement had been terminated and alleged that NW&A appeared to have a conflict of interest from receiving the proceeds of potentially avoidable fraudulent transfers.

On October 21, 2013, Donald Wolf, Jr. and David Wolf commenced voluntary Chapter 11 cases that also are pending before this court. They are represented by the Rockford law firm of Barrick, Switzer, Long, Balsley & Van Evera in those cases. Their father, Donald Wolf, Sr., represented by different counsel, initially filed for protection under Chapter 11 in Florida on October 28, 2013. His case was transferred to this court on June 18, 2014 and he is now also represented by members of the Barrick, Switzer law firm. The bankruptcy cases brought by the Wolf Individuals have been procedurally consolidated for joint administration with the Chardon Corporate Debtors' cases.

On February 18, 2014, attorney Wolf filed a notice of change of firm affiliation to indicate that NW&A had merged into Much Shelist, PC on February 17, 2014. Later, on June 4,

2014, he filed a supplemental declaration describing the merger's effect upon the proposed representation of the Chardon Corporate Debtors.   He attached to this declaration a letter agreement signed by Donald Wolf, Sr., on behalf of Wolf Realty and the Chardon Corporate Debtors, which stated that the team of former NW&A attorneys, now at Much Shelist, would continue to represent the Chardon Corporate Debtors under the fee arrangement as had been proposed by NW&A.  This declaration went on to assert that Much Shelist was disinterested, neither holding an interest adverse to the estate nor representing any person having such an interest.  It further disclosed that Much Shelist had previously represented FirstMerit and its predecessor, Midwest Bank & Trust Company, including a litigation matter that concluded shortly before the NW&A merger.  As of the date of the merger, according to the declaration, Much Shelist did not represent FirstMerit.  The declaration also stated that none of the past matters in which Much Shelist represented FirstMerit related to the Chardon Corporate Debtors in any way, and that Much Shelist circulated a "conflicts wall memo barring any NW&A attorney from participating in or being given access to any file relating to" FirstMerit.

The objecting parties requested extensive discovery after which the court conducted a multi-day trial in September, October and November, 2014.

## ANALYSIS

A.  Disclosure Requirements for the Employment of Professionals.

The court recently discussed the disclosure requirements of Section 327 of the Bankruptcy Code and Fed. R. Bankr. P. 2014 in *In re Rental Systems, L.L.C.*, 511 B.R. 882 (Bankr. N.D. Ill. 2014).  At first blush, this case seems to bear many similarities with *Rental Systems*, including the debtor's counsel, Neal Wolf.  However, key factual differences are quite different.  As discussed below, the delays here were shorter, the initial omissions were more readily cured and, most notably, the record does not present the same issues of divided loyalties

towards a non-debtor principal or other non-debtor affiliates as found in *Rental Systems*.

Section 327(a) of the Bankruptcy Code permits a debtor in possession to employ only attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons." *In re Knight-Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012). Bankruptcy Rule 2014(a) "facilitates enforcement of section 327(a) by requiring that professionals seeking to represent the trustee in a bankruptcy proceeding submit a verification that fully and broadly discloses 'the person's connections with the debtor, creditors, [or] any other party in interest,' among others." *Id.* (quoting Fed. R. Bankr. P. 2014(a)). These disclosure requirements "apply to all professionals and are not discretionary." *U.S. v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999). Specifically, Rule 2014(a) requires that any application for employment under Section 327:

> shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a). The "connections" that must be disclosed are "'considerably broader' than the disclosures required for section 327(a)." *Knight-Celotex*, 695 F.3d at 722 (citing *In re Gluth Bros. Constr., Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011)). "Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted in 2016(b) statements and affidavits and to root out the existence of undisclosed conflicts of interest." *In re Crivello*, 134 F.3d 831, 839 (7th Cir. 1998).

Although neither Section 327 nor Rule 2014 explicitly state that court approval must be obtained before an attorney provides services, the Seventh Circuit has "recognized that prior approval is strongly preferred and has been required as a matter of sound judicial administration." *In re Cashen*, No. 01-1769, 56 Fed. Appx. 714 (7th Cir. Dec. 12, 2002) (quotation marks omitted); *In re Singson*, 41 F.3d 316, 319 (7th Cir.1994). If parties fail to obtain prior approval, "the court can grant retroactive approval if the parties demonstrate 'excusable neglect.'" *Id.* Counsel who "fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *In re Am. Intern. Refinery, Inc.*, 676 F.3d 455, 465-66 (5th Cir. 2012). This is especially the case if the failure to disclose is intentional, since "a bankruptcy court should punish a willful failure to disclose the connections required by Fed.R.Bankr.P. 2014 as severely as an attempt to put forth a fraud upon the court." *Crivello*, 134 F.3d at 839. Ultimately, the bankruptcy court must "gauge the ongoing interplay of factors and … make the delicate judgment calls which such a decision entails." 134 F.3d at 839.

The Bankruptcy Rules also require attorneys representing the debtor in connection with a bankruptcy case to file a disclosure of compensation given or promised and the source of such compensation. "Courts have a need and a right to full, unfettered disclosure of all fee and financial arrangements between debtors and their attorneys." *In re Pawlak*, 483 B.R. 169, 178 (Bankr. W.D. Wisc. 2012) (quotation marks omitted). This disclosure is essential to enable the court to meaningfully examine and regulate fees under Sections 329, 330 and 331, and reflects "a congressional concern that there might be the 'potential for overreaching' by debtors' counsel." *Pawlak*, 483 B.R. at 178 (quoting *In re Nelson*, 424 B.R. 361, 364 (Bankr. N.D. Ill. 2009)). *See also Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045 (9th

Cir.1997) (The Bankruptcy Code contains a number of provisions "designed to protect the debtor

from the debtor's attorney.").

Bankruptcy Rule 2016(b) provides that:

Every attorney for a debtor, whether or not the attorney applies for compensation,
shall file and transmit to the United States trustee within 14 days after the order
for relief, or at another time as the court may direct, the statement required by §
329 of the Code including whether the attorney has shared or agreed to share the
compensation with any other entity. The statement shall include the particulars of
any such sharing or agreement to share by the attorney, but the details of any
agreement for the sharing of the compensation with a member or regular associate
of the attorney's law firm shall not be required. A supplemental statement shall be
filed and transmitted to the United States trustee within 14 days after any payment
or agreement not previously disclosed.

Official Form B203 is to be used for disclosure of compensation of an attorney for a debtor. See

Fed. R. Bankr. P. 9009 (the Official Forms "shall be observed and used"); *Fadayiro v.*

*Ameriquest Mortg. Co.*, 371 F.3d 920, 922 (7th Cir. 2004) ("unlike normal federal civil practice,

where the forms are illustrations, in bankruptcy they are mandatory"). Additionally, General

Order No 11-2 of this court requires debtors' counsel to file a copy of their written fee agreement

with the court. "Each such agreement must be attached" to the initial disclosure statement "in all

bankruptcy cases." Second Amended General Order No. 11-2 (Bankr. N.D. Ill. Sept. 21, 2011).

And "[a]ny agreement entered into after the filing of the statement under Rule 2016(b) must be

filed as a supplement to that statement within 14 days of the date the agreement is entered into."

Id.

Here, the application to employ NW&A, which included a description of the retainers he

had received and the terms of his agreement for compensation, was filed exactly one month after

the petition date. Thus, the first disclosure of compensation occurred 16 days after the 14-day

deadline set by Rule 2016(b). Attorney Wolf testified that the disclosure was late because there

were eight debtors, requiring the attorneys to put together huge amounts of information for

schedules, and other pressing matters such as battles over the use of cash collateral. The delay

was relatively short and there appears to be little prejudice resulting since the motion to employ

and disclosure of compensation were filed on the Debtors' own initiative well before the Section

341 meeting of creditors.  While applications to employ need to be filed as quickly as possible,

the court is also mindful that for most cases Bankruptcy Rule 6003(a) prescribes a 21-day period

from the petition date before the court may approve the debtor-in-possession's application to

employ counsel. Fed. R. Bank. P. 6003(a).  This by no means implies that a debtor-in-possession

can wait 21 days to *file* its application, but does tend to put the question of prejudice arising from

a short delay in perspective.

The court finds Neal Wolf's explanation for the delay to be plausible.  Unlike the debtor

in *Rental Systems*, which was a single entity with few assets, no employees and no real

operations, here NW&A was representing eight closely inter-related entities holding and

operating multiple real estate properties.  The Chardon Corporate Debtors filed a motion for joint

administration, which was granted on May 9, 2013, about a week before the application to

employ was filed.  The Chardon Corporate Debtors also sought and obtained two extensions of

the time to file schedules, first through May 15, 2013 and then through May 31, 2013.  Here the

application to employ and initial disclosures of connections and compensation were filed before

the extended deadline to file schedules expired.  That the court granted the motions to extend

reflects the complex nature of the cases, which may have made preparation of the application and

required disclosures under Rule 2014 more complicated.

Although the Debtors did not file a copy of the April 17 engagement letter and the Form

B203 formal disclosure of compensation until June 4 and June 5, 2013, respectively, these

submissions were on file before the Section 341 meeting of creditors and within a week of the

deficiencies being identified in the objections to the employment application.  Much of the

information contained in the formal disclosures appeared earlier in the initial application to employ. Attorney Wolf also testified that it was his mistake not to include a copy of the retention agreement with the application but that he did so through a supplemental declaration upon his learning of the oversight. The court is similarly satisfied from the testimony that the failure to initially describe the prior limited representation of the Wolf Individuals was inadvertent and a product of initial confusion that was quickly cured in the supplemental disclosure submitted shortly after it was raised in the objections.

Unlike *Rental Systems*, where counsel had continued to represent the nondebtor affiliates post-petition, the evidence presented in this case shows that the prior representation terminated pre-petition. Also unlike in *Rental Systems*, where counsel had prepared and filed an answer to the complaint on behalf of the nondebtor affiliates, NW&A's involvement in the single matter lasted a few weeks and involved the filing of an appearance, requesting deadline extensions, accepting service and brief informal settlement discussions that included potential global settlement of various debts of the Chardon Corporate Debtors. Based on the fact that the Wolf Individuals quickly obtained different counsel in the nonbankruptcy litigation, engaged different counsel in connection with their individual bankruptcy cases, and the uncontroverted testimony of the witnesses to the engagements, the court is satisfied that the Wolf Individuals understood that Neal Wolf and his firm no longer represented them individually as of and after the Chardon Corporate Debtors' petition date.

The U.S. Trustee notes that NW&A did not produce the December 20, 2012 engagement letter with the Wolf Individuals until July 24, 2013 and only after the court compelled it to do so. But that is more of a discovery dispute that has been resolved. The court does not find that disqualification of the Debtors' choice of counsel is the appropriate sanction for delay in turning over the requested document. In particular, NW&A initially asserted an attorney/client privilege

– notably a privilege of Wolf Individuals who were not at the time bankruptcy debtors – and after the court entered an order on July 15, 2013 requiring disclosure of certain categories of documents, NW&A quickly produced the engagement letter.   Noting that the December engagement letter does not expressly reference any of the Chardon Corporate Debtors, the court finds at the very least that the Chardon Corporate Debtors held a good faith initial belief that its filing was not required.  General Order No. 11-02 requires filing of agreements for compensation between a debtor and the debtor's attorney.  The December 2012 letter signed by attorney Wolf only mentions by name Donald Wolf, Sr., Donald Wolf, Jr., David Wolf and Wolf Realty, none of whom were bankruptcy debtors at the time.   The letter referenced none of the Chardon Corporate Debtors.  Although Donald Wolf, Sr., Donald Wolf, Jr. and David Wolf subsequently filed bankruptcy cases, NW&A never represented the Wolf Individuals in their bankruptcy cases.

That NW&A had entered into a retention agreement with the Wolf Individuals is a "connection" that needed to be disclosed.   In its June supplemental disclosure NW&A did disclose that it briefly had been retained by the Wolf Individuals in December 2012.  Further, the April 17, 2013 engagement letter made express reference to the December 20, 2012 retainer, stating that the fees would be at the same rate as under the earlier agreement.  And the court is satisfied by attorney Wolf's uncontroverted testimony explaining that the seeming contradiction between the letter's statement that "[y]ou have provided NW&A with a $25,000 retainer" with his statement in his supplemental declaration that he never received any retainer or fee "from the Wolf Individuals," was in fact consistent as the letter's referenced retainer was the *same retainer* from the Rink of Crystal Lake, Inc. that was disclosed in the original application to employ. Under these circumstances, the court does not find that disqualification of counsel to be either warranted or appropriate.

B. Lack of Disinterestedness or Conflict of Interest

A chapter 11 debtor-in-possession may employ an attorney to represent or assist it in carrying out its duties under the Bankruptcy Code only if the attorney does "not hold or represent an interest adverse to the estate" and is a "disinterested person[]." 11 U.S.C. § 327(a). However, the mere facts that NW&A represented the Chardon Corporate Debtors pre-petition or may have represented one or more creditors of the Chardon Corporate Debtors will not disqualify the attorneys unless that representation is shown to have created "an actual conflict of interest." 11 U.S.C. §§1107(b); 327(c).

A "disinterested person" for purposes of Section 327 is one who:

(A)    is not a creditor, an equity security holder, or an insider;
(B)    is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
(C)    does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. §101(14). Disinterestedness "goes to the heart of the integrity of the administration of the bankruptcy estate" and "reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate." *U.S. v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) (citing *Crivello*, 134 F.3d at 835). The phrase "or for any other reason" found at the end of the definition is a "catch-all clause . . . sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.'" *Id.* at 835 (quoting *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991)).

In addition, the prospective attorney may not "hold or represent an interest adverse to the estate." 11 U.S.C. § 327(a). The Seventh Circuit has defined this as:

(1)    to possess or assert any economic interest that would tend to lessen the

value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

(2)      to possess a predisposition under circumstances that render such a bias against the estate.

*Crivello*, 134 F.3d at 835-36 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)). Together, "the statutory requirements of disinterestedness and no interest adverse to the estate serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Id.* at 836 (quotation marks omitted).

The U.S. Trustee and FirstMerit argue that NW&A is either not disinterested or holds or represents an interest adverse to the estate because it received $250,000 in pre-petition retainers from Wolf Builders, a non-debtor affiliate of the Chardon Corporate Debtors. They allege that Wolf Builders received fraudulent transfers of money from the Chardon Corporate Debtors during the year before they commenced these cases and that the retainers were paid with proceeds of those transfers. Claiming a possibility that the retainers could be avoided and clawed back into the estate as proceeds of a fraudulent transfer, the objectors argue NW&A has an adverse interest that disqualifies it from representing the Corporate Debtors.

Neither the U.S. Trustee nor FirstMerit have presented more than speculation to support this argument. Moreover, even if the court were to assume *per arguendo* that the payments from the Chardon Corporate Debtors to Wolf Builders were fraudulent transfers, NW&A was not the initial transferee. Under Section 550(b), a trustee or debtor-in-possession may not recover an avoided transfer from a subsequent transferee who "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). There is no evidence that NW&A is not a subsequent good faith transferee exempted under Section 550(b)(1). See *Wasserman v.*

*Bressman (In re Bressman)*, 327 F.3d 229, 235 (3rd Cir. 2003) (the "law firms' affidavits provided prima facie evidence that they had no reason to know that the challenged fees came from the trust and the Trustee had not satisfied its burden of producing sufficient evidence to support a contrary inference.").

The evidence presented here indicates instead that NW&A received the retainers in exchange for past and future promised legal services on behalf of the Chardon Corporate Debtors. If there was any doubt about whether NW&A would in fact perform its promised legal services, that is clearly no longer the case as by now there is no dispute that NW&A has provided legal services to the Chardon Corporate Debtors' estates far exceeding the amount of the retainers or, indeed, all the alleged funds transferred. Attorney Wolf states in his affidavit, which has not been controverted, that as of July 10, 2014, NW&A (and later Much Shelist), had expended over $1.1 million in attorney's fees and over $16,000 in expenses on the Chardon Corporate Debtors' bankruptcy cases without having received any payment to date. (EFC No. 770). He testified credibly that he believed the payment of the retainer was not an avoidable fraudulent transfer. Rather than proceeds of a potential fraudulent transfer from the corporate debtors to Wolf Builders, the witnesses testified that Wolf Builders acts as the central cash management agent on behalf of the Chardon Corporate Debtors, holding a central bank account out of which payments on behalf of the Chardon Corporate Debtors are made. Therefore, the funds are held by Wolf Builders only in trust for the Chardon Corporate Debtors. As such, the payment of the retainer by Wolf Builders is no different than a payment made directly by NW&A's clients, the Chardon Corporate Debtors.

In *Rental Systems* this court was concerned that where the legal fees had been paid or were expected to be paid by a third party, the attorney might be influenced to represent the interests of that third party rather than the debtor. Even if there is no formal arrangement, an

attorney who knows that he or she will be paid by the third party may be wary of acting against that party, even if in the client/debtor's best interest. But in many ways, this case presents the inverse situation. Whereas in *Rental Systems* the debtor had no substantial assets or real sources of income, and relied entirely on the principals and nondebtor affiliates, here the Chardon Corporate Debtors own the majority of assets and generate significant rental income. Indeed, the objectors do not dispute that the original source of funds for the NW&A retainer was the Chardon Corporate Debtors. Additionally, in *Rental Systems* the attorney seemed to have taken actions that benefited the insiders rather than the debtor, such as filing a proceeding attempting to enjoin actions to enforce guarantees by the insiders before even filing an application to employ or disclosing the connection to the insiders. In contrast here, other than the objecting parties' suggestion that the Chardon Corporate Debtors have been reticent to seek to avoid the prepetition transfers to Wolf Builders, there is no suggestion that NW&A is acting for the benefit of Wolf Builders instead of the Chardon Corporate Debtors.

Further, it is uncontroverted that Wolf Builders has agreed to voluntarily contribute an amount in excess of the transfers to or for the benefit of the Chardon Corporate Debtors. Wolf Builders has already paid $250,000 in retainers to the Chardon Corporate Debtors' counsel for legal services provided to the Chardon Corporate Debtors, as well as $50,000 in retainers to Plante & Moran to provide accounting and financial consulting services to the Chardon Corporate Debtors. These retainers constitute nearly 75% of the purportedly avoidable transfers, and remain subject to this court's approval under Sections 329 and 330. Wolf Builders also apparently continues to provide the services of its employees to the Chardon Corporate Debtors, who have no employees of their own. The Chardon Corporate Debtors have proposed a plan of reorganization, apparently with the support of Wolf Builders – which is owned by the Wolf Individuals – that provides for Wolf Builders to be substantively consolidated with the Chardon

Corporate Debtors which would effectively result in Wolf Builders contributing all of its assets

to the Chardon Corporate Debtors' estates.  Additionally, because Wolf Builders is solely owned

by the Wolf Individuals, who are now bankruptcy debtors in jointly administered cases, any

assets of Wolf Builders are at least indirectly subject to this court's jurisdiction.  The fact that the

Chardon Corporate Debtors have not filed an adversary complaint regarding transfers to their

central cash management agent for the retainer of legal counsel for the Debtors, without more,

simply does not show that NW&A is conflicted and, therefore, disqualified from employment

here.

    C.  <u>Effect of the Merger With Much Shelist</u>

    FirstMerit also contends that the former NW&A attorneys became conflicted when they

joined Much Shelist because FirstMerit had been a client of that firm.  The evidence does not

support the conclusion that the attorneys are disqualified as a result of the law firm's merger.

    It is undisputed that by the time NW&A merged with Much Shelist, FirstMerit no longer

was Much Shelist's client.  Section 327(c) of the Bankruptcy Code provides that "a person is not

disqualified for employment under this section solely because of such person's employment by

or representation of a creditor" unless "there is an actual conflict of interest."  The evidence,

however, does not establish the existence of an actual conflict of interest.  Rather, the record

discloses that Much Shelist's past representation of FirstMerit involved discrete matters

unrelated to the Chardon Corporate Debtors.  No credible argument has been presented that

shows Much Shelist possessing information through the terminated engagement that either

related to the Chardon Corporate Debtors or could be used to the disadvantage of FirstMerit in

this case.

    FirstMerit instead invokes the so-called "hot potato doctrine" to argue that it was

unethical for Much Shelist to conclude its representation of the bank shortly before the merger

with NW&A.  According to this doctrine, when "a lawyer or law firm suddenly finds itself in a

situation of simultaneously representing clients who either are presently adverse or are on the

verge of becoming adverse, it may not simply [] drop one client 'like a hot potato' in order to

treat it as though it were a former client for the purpose of resolving a conflict of interest

dispute." *Valuepart, Inc. v. Clements*, No. 06-C-2709, 2006 WL 2252541 (N.D. Ill. Aug. 2,

2006). *But see Metro. Life. Ins. Co. v. Guardian Life Ins. Co.*, No. 06-C-5812, 2009 WL

1439717 (N.D. Ill. May 18, 2009) (cautioning that in the application of the "hot potato doctrine"

courts "should not be overly eager to substitute a clever phrase for thorough legal analysis").

The district court in *Installation Software Techs. Inc. v. Wise Solutions, Inc.* concluded

that it is appropriate to limit the doctrine's application in the context of mergers.  No. 03-C-4502,

2004 WL 524829 (N.D. Ill. Mar. 5, 2004).  Limitation is necessary, the court explained, because:

> The explosion of merger activity by corporations during the past
> fifteen years, and the corresponding increase in the possibility that
> attorney conflicts of interest may arise unexpectedly, make it
> appropriate for a court to adopt a perspective about the
> disqualification of counsel in ongoing litigation that conforms to
> the problem. This means taking a less mechanical approach to the
> problem, balancing the various interests. The result is that the
> courts are less likely to order disqualification and more likely to
> use other, more tailored measures to protect the interests of the
> public and the parties.

2004 WL 524829 (quoting *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121,

1126 (N.D. Ohio 1990)).  Although *Gould* discussed the issues arising from clients mergers,

similar issues arise with law firm mergers. Indeed, Section 327(c), recognizes the  increasing

difficulty in large Chapter 11 cases to find the services of competent counsel with sufficient

resources and experience who do not or have not represented a creditor in unrelated matters.

Thus, courts have employed a balancing test, rather than a mechanical test, to determine

whether the former engagement warrants disqualification.  In doing so, courts weigh factors

including:

> (1) the resulting prejudice, if any, to the party moving for disqualification because the concurrent representation (i.e., whether confidential information has been exchanged and whether that confidential information is related to the present case); (2) the costs of disqualification to the non-moving party (financial expenses and the costs of retaining new counsel); (3) the complexity of the case; and (4) the origin of the conflict (i.e., whether it arose through an affirmative act of the party opposing disqualification).

*Id.* (quoting *Gould*, 738 F. Supp. at 1126–27).

The facts presented do not support First Merit's invocation of the "hot potato doctrine" to oppose the employment of the NW&A attorneys. It is uncontroverted that Much Shelist's active representation of FirstMerit had ended prior to the merger. No evidence has been presented to show that the merger was unrelated to this case and not in some fashion a strategic move involving First Merit. Indeed, as noted in *Valuepart*, the doctrine is more applicable to situations where a firm seeks to terminate representation in the middle of litigation "without warning and not because of any natural conclusion or closure of the pending matters." 2006 WL 2252541 ("[the] firm was plainly still handling ongoing matters for ValuePart when it elected to 'fire the client' in order to pursue the interests of other client."). *See also Metro. Life.*, 2009 WL 1439717 ("[I]t is not so clear that the 'hot potato doctrine' applies in those instances in which a lawyer's representation is sporadic, non-litigious and unrelated to the issues involved in the newer case, as we see here."). Here the weight of the evidence favors permitting Much Shelist to remain as counsel for the Chardon Corporate Debtors. FirstMerit admits that the matters Much Shelist handled were unrelated to these cases and have been completed. Neal Wolf and his colleagues have been representing the Chardon Corporate Debtors in these 8 Chapter 11 cases for some time. The case is quite complex, involving eight corporate debtors, three individual debtors, and numerous non-debtor affiliates and there can be no dispute that the Chardon Corporate Debtors

will suffer great, if not crippling cost, and the cases and all parties of interest thereto will encounter great delay, inconvenience and waste if the Debtors are now forced to seek new counsel.

Finally, as the court noted in *Metro. Life,* even in cases where an ethical violation may have occurred disqualification is "a drastic measure" that must be separately shown to be appropriate for the circumstances shown. Where, as here, the record shows that the past work for the prior client is "wholly unrelated to" the work for the current client, that counsel had no access to confidential information that it could use in the present case and that the attorneys did not "forge relationships with any potential witnesses," disqualification is improper. 2009 WL 1439717 at *5. As such, the Much Shelist merger provides no basis for the requested employment of counsel.

D. Wolf Realty

FirstMerit also objects that Much Shelist currently and simultaneously represents Wolf Realty, a non-debtor affiliate of the Chardon Corporate Debtors who has a direct conflict with the Chardon Corporate Debtors based on prepetition real estate management contracts. FirstMerit argues that the March 19, 2014 letter agreement from Neal Wolf to Donald Wolf, Sr. discussing the transition from NW&A to Much Shelist shows that NW&A represented and Much Shelist continues to represent Wolf Realty. FirstMerit draws this conclusion because the letter is addressed to "Donald Wolf, Sr., Wolf Realty, 610 N. Route 31, Suite A, Crystal Lake, IL 60012," and because immediately preceding Donald Wolf, Sr.'s signature, it states:

> On behalf of Wolf Realty and the following listed entities, I hereby authorize (i) Neal Wolf & Associates, LLC immediately to transfer all case files and case responsibilities relating to Chardon LLC, Chardon II, LLC, Intervest, LLC, The Rink of Crystal Lake, Inc., Wolf Business Center, Inc., Wolf Family Partnership, LLC, Wolf Investments, Inc., and Wolf Professional Center Corporation to the law firm of Much Shelist, PC, (ii) Much Shelist, PC and Neal L. Wolf immediately to assume such responsibilities, and (iii) Much Shelist, PC and Neal

> L. Wolf to take such steps and file such documents as are reasonable and
> necessary in order to effectuate the foregoing in an expeditious manner.

(Supplemental Declaration, ECF No. 649, Ex. A.) It appears, however, that the objectors read

more into the letter than what its terms actually say. The March letter is clear that NW&A is to

"assume," as the letter phrases it, "all case files and case responsibilities relating to" the eight

named Chardon Corporate Debtors. Wolf Realty is not included among them. That the letter

was directed at and addressed to Don Wolf, Sr. at the Wolf Realty mailing address does not alter

that fact. Simply by virtue of the letter being sent to Mr. Wolf, the representative of the Chardon

Corporate Debtors via that mailing address does not evidence an agreement to represent Wolf

Realty, particularly when the body of the letter specifies in detail each party to be represented.

Lest there remain any doubt, Neal Wolf credibly testified as to his understanding that Wolf

Realty was an agent on behalf of the various Chardon Corporate Debtors, which also explain

why invoices from NW&A for Chardon Corporate Debtor matters were sent to "Wolf Realty c/o

Donald L. Wolf, 610 N. Route 31, Suite A, Crystal Lake, IL 60012."

NW&A also sent its April 17, 2013 engagement letter to Donald L. Wolf, Sr. at the Wolf

Realty mailing address. Again, the letter does not state that the lawyers are or will represent

Wolf Realty. The section of the engagement letter entitled "Parties Represented" lists only the

eight Chardon Corporate Debtors as the entities "NW&A has been engaged to represent." This

letter is signed by Donald Wolf, Sr. as "Authorized Signatory" of each of the eight Chardon

Corporate Debtors. And again, the March 19, 2014 letter agreement with Much Shelist, while

addressed to Don Wolf, Sr. at the Wolf Realty mailing address, only provides for NW&A

transferring to Much Shelist the case files and case responsibilities relating to the to the eight

Chardon Corporate Debtors. The testimony presented at trial did not suggest facts to the

contrary, let alone establish that the NW&A attorneys represented the non-debtor affiliate at or

after the commencement of these cases.

      E.  <u>Request for Retroactive Authorization</u>.

      In the Debtors' application to employ Neal Wolf, filed May 17, 2013, they seek retroactive approval to the petition date, April 17, 2013. The Seventh Circuit has held that, while prior approval of employment is "strongly preferred," the court "can grant retroactive approval if the parties demonstrate 'excusable neglect.'" *In re Cashen*, No. 01-1769, 56 Fed. Appx. 714 (7th Cir. Dec. 12, 2002) (citing *In re Singson*, 41 F.3d 316, 319 (7th Cir. 1994)). The Supreme Court has held that the determination of whether neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission", including "the danger of prejudice [to the non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993).

      Attorney Wolf testified that the delay in filing the employment application was caused by the complexities of the case – which involved eight corporate debtors – and that he and his firm were preoccupied by matters of higher priority to the Debtors and the case, including battles over cash collateral and the preparation of the Debtors' bankruptcy schedules. Attorney Wolf's explanation is supported by the record. The court notes that the Debtors filed a timely motion to extend the time to file schedules through May 15, 2013, and later extended through May 31, 2013, which the court granted. The court also notes that FirstMerit filed a written objection to the Debtors' initial motion for use of cash collateral on May 3, 2013. Although the motion to extend time to file schedules did not specifically mention the time to file an employment application or disclosures pursuant to Rules 2014 and 2016, attorney Wolf may have believed such time was extended as well.

The delay was also of a relatively short time. This delay was significantly shorter than the ten week delay in *In re Rental Systems, L.L.C.*, 511 B.R. 882 (Bankr. N.D. Ill. 2014), or the three month delay in seeking approval of the employment of Plante & Moran in this case. (See Plante & Moran Order filed concurrently herewith). Also unlike in Rental Systems, here the application was filed almost a month before the Section 341 meeting of creditors, meaning that creditors had the information disclosed in the application well before the creditor's meeting. The credible testimony of Neal Wolf as to the cause of the delay shows that it was caused by a good faith mistake. There is no showing that any creditors suffered undue prejudice because of the delay in filing the application. It is true that timely employment applications are necessary for the proper functioning of the bankruptcy system and prior approval "is strongly preferred because it permits close supervision of the administration of an estate, wards off 'volunteers' attracted to the kitty, and avoids duplication of effort." *In re Singson*, 41 F.3d 316, 319 (7th Cir.1994). However, the Bankruptcy Rules also show concern about the entry of certain orders, including employment orders, early in a case before creditors have an opportunity to react to the petition or to form committees. Bankruptcy Rule 6003, for example, provides that a court shall not grant an application to employ under Rule 2014 within 21 days after the filing of the petition except to the extent that relief is necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 6003. While the 2011 advisory committee notes to Rule 6003 note that the rule does not prevent a debtor from filing a motion prior to the expiration of the 21 days, they also note that the rule does not "prevent the court from providing an effective date for such an order that may relate back to the time of the filing of the application or motion, or to some other date." Fed. R. Bankr. P. 6003 advisory committee's note to 2011 amendment.

Further, in contrast to the Debtors' accounting firm who was retained post-petition, Neal Wolf was retained pre-petition in part to help the Debtors prepare to file their petitions. Thus, it

was inevitable that at least some of the work he and his firm performed would occur before this court could approve the employment. Additionally, since Neal Wolf's firm was the only counsel representing the Debtors in the bankruptcy – and because the corporate Debtors cannot represent themselves without counsel – there is little risk of duplication of services. Moreover, because Neal Wolf filed the petition and he and his colleagues filed formal appearances on behalf of the Debtors on the same day as the petition there can be no concern that they were representing the Debtors in secret. While the importance of disclosures under Bankruptcy Rules 2014 and 2016 for the determination of the disinterestedness of counsel and the reasonableness of fee requests cannot be overemphasized, the record does not show that the short delay that occurred here caused any significant harm or prejudice.

Thus, while prior approval is strongly preferred, the court finds that under the particular circumstances presented here the Debtors have demonstrated that their failure to seek approval of the employment of Neal Wolf and his colleagues prior to May 17, 2013 was caused by excusable neglect. The request for retroactive approval to the petition date of April 17, 2013 will, therefore, be granted.

## CONCLUSION

For the foregoing reasons, the application to employ Neal Wolf and the other attorneys of record at Much Shelist will be granted, made effective from the petition date. A separate order will be entered consistent with this Memorandum Opinion.


DATE: September 2, 2015                    ENTER:

_____

Thomas M. Lynch
United States Bankruptcy Judge